We'll hear argument this morning in Case 11-1285, U.S. Airways v. McCutchen. Mr. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. ERISA permits plan fiduciaries to seek appropriate equitable relief to enforce the terms of the plan. Six years ago, this Court in Saraboff concluded that reimbursement actions by ERISA plans, such as the one at issue here, seek equitable liens by agreement. And because the plan's claim here is one for an equitable lien by agreement, that means one parcel of equitable defenses, those derived from adjustment and enrichment, offer no help to respondents. Mr. Katyal, if you go to equity, why aren't you bound by equity? We certainly are, Justice Sotomayor, bound by equity. Our contention is not that once you say the magic words, equitable lien by agreement, that somehow transforms into a we win as plaintiffs rule. Well, but that's exactly what your bottom line is, which is you have someone else do the work for you and you don't pay them. Quite to the contrary, Justice Sotomayor. Our position is that the rules of equity bind equitable liens by agreement just as they bind anything else.  Sotomayor, so why does your lien have priority to the attorney's lien that is normally created at commencement of the litigation? Why is the attorney bound by the agreement you signed with the beneficiary? So our position is that the attorney doesn't – there is no lien created with the attorney that once Mr. Sereboff entered into an agreement with U.S. Air, that agreement said provided for a 100 percent reimbursement right. And there is no – essentially what happened is Mr. Sereboff – excuse me, Mr. McCutcheon double promised his money. He promised it first to the U.S. Airways plan, and then he promised it to his attorneys. And that's a problem that he might have with his attorneys, although as I understand the facts here, maybe that debt has been forgiven, but it is not something that creates an independent lien on the money that's at issue here. That is, the rules in equity say that it is the agreement that controls when we're talking about an un – when we're talking about an equitable lien by agreement. Ginsburg. Ms. Sereboff that you referred to, that certainly describes the lien you rely on, but there's a footnote toward the end that leaves open the make-whole doctrine and I assume also the common fund doctrine, so it's an open question. So our position is not that Sereboff's letter controls this case. We do think the reasoning of Sereboff essentially does decide the question, because what Sereboff said, Justice Ginsburg, and this is at page 368 of the opinion in the text, it said the Sereboffs had argued a make-whole doctrine, and the – in response, what this Court said is, quote, "'Mid-Atlantic's' claim is not considered equitable because it is a subrogation claim. Mid-Atlantic's action qualifies as an equitable remedy because it is indistinguishable from an action to enforce an equitable lien established by agreement, of the sort epitomized by our decision in Barnes. Mid-Atlantic need not characterize its action as a freestanding action for equitable subrogation. Accordingly, the parcel of equitable defenses the Sereboffs claim accompany any such action are beside the point. Beside the point. And our position is, once the Court has decided that the type of action that is at issue here is an equitable lien by agreement, the relevant doctrine, and this is a further answer to you, Justice Sotomayor, that the Court is to look to is, how are equitable liens by agreement evaluated in equity? And those rules in equity say that, again, the general rules of equity apply and govern that, but the one place, the one set of defenses that aren't governed are those that sound an unjust enrichment. Kennedy. Kennedy. I recognize that we're talking about a matter of Federal law here. What about the law of most of the States? Suppose there's an agreement with an insurer and an insured that says the insured gets 100 percent of the proceeds. I would think that the law of most States gives a superior lien to the attorney for the contingent fee, notwithstanding the agreement. I'm not sure of that. It's just an assumption. That is true in some subrogation States. However, even with respect to that, when you have — as long as it's not abrogated by statute or something like that. But if you simply have an agreement by an insured and it provides for 100 percent reimbursement and abrogation of the common fund, even there, Justice Kennedy, the agreement is enforced. So State Farm v. Clinton, which is a case cited in our brief, as long — as well as the Dobbs case and other decisions, the Arkansas Supreme Court in 1969, the Arkansas Court in 1931, have all said that if you have an insurance agreement that abrogates the common fund doctrine, that that agreement is enforced. And here, of course, we're dealing— Ginsburg. Where is that abrogation in this, not the plan description, but the plan itself? What clear language in the plan, as far as the— Justice Ginsburg, the district court at pages 30A to 32A of the petition appendix had two pages that found the agreement clear and unambiguous with respect to abrogation of the common fund doctrine. And the plan itself is found at joint appendix page 20. That finding by the district court was never appealed to the Third Circuit. It was not appealed to this Court. And indeed, the brief in opposition conceded this issue. Kennedy, that's the summary of the plan, page 20. That's not the plan description. Yes. The summary plan description is at page— I'm asking about the plan itself, because the plan controls if there's a description of the plan. Exactly. And so the plan itself was submitted, I believe, a few days ago. The Respondents have now made an issue of it. Yes. And I don't — you make a distinction between a reimbursement clause and a subrogation clause. And this, as far as I can tell from the plan, is no reimbursement clause. The only one that's there is labeled subrogation. And I looked at what's in the plan, and I don't see language that clearly abrogates the common fund. Your Honor, I suppose that they could have made this an issue when they appealed the district court's finding on this. They didn't. And, indeed, there was discovery— You want us to decide the case without looking at the plan? I have before me the same language that I believe Justice Ginsburg is looking at. And I think she's quite correct. The word abrogation, of course, is not used, but neither is the concept. I didn't think we took this case to review the plan. Is that what the Supreme Court took the case for, to say what this particular individual plan said?  Had that point been raised, we would not have taken the case. In much to the contrary, Justice Scalia, exactly. This is the way that they framed the brief in opposition, the question presented, is this. Whether a seriously injured ERISA beneficiary must reimburse his ERISA plan for 100 percent of his medical expenses simply because the plan language so provides. Well, simply because the plan language. I mean, obviously, we have to look at the plan language to see what you're relying on the plan language. You cite the summary, but you don't cite the main plan. Two things, Justice Kennedy. First, that brief in opposition goes on to say that that plan was clear with respect to the common fund doctrine and others at page 5. But second, if you're concerned. I'm sorry. Excuse me. Please. The second point. The second point is, even if you are concerned about any discrepancy, 4.2 of the actual plan itself, and this is page 22 of the PDF that was submitted by, lodged by my friends on the other side a few days ago, has essentially an anti-Amara clause in it. It says that the benefits that are provided under the plan are those put forth in the summary plan description. So there is no discrepancy between the SPD and the plan in this case, unlike in Amara, where there very well was a discrepancy. So here's your point. I'm sorry. The phrase that you just read says that the benefits are the same. It doesn't say that the reimbursement of subrogation language are the same. So go back to Justice Ginsburg's question and point out in the plan what words you're relying upon, not the summary, but the plan. So the plan has in 4.7 two things. It has the plan, quote, So I don't think that there's any discrepancy, Justice Sotomayor, and to the extent that this Court were concerned about it, there were four years for them to have made this an issue, but this is just about as procedurally barred as any of the other So if I were Joe Smith and a plan, the plan pays me a hundred — I have medical expenses of $100,000, and actually the — there was a driver who caused this problem, and later I collect $100,000, but I have to pay $50,000 to get the $100,000. So I'm left with $50,000 net, because I had to pay my lawyers, I had to pay my witnesses, there were a lot of different things I had to pay. I'm left with $50,000 net. So in comes the plan and says we want $100,000. I say, what? Then I look at the language. The language allows them to get back expenses which were recovered from the third party. I didn't recover $100,000 from the third party. I recovered $50,000 from the third party, because it cost me $50,000 to get the $100,000. Now, if I were a judge and listening to that, I would say, assuming they wanted a reasonable interpretation of this language, sounds pretty reasonable to me. Katyalin. In Justice Breyer, if you were the district court judge in this case, I suppose you could have reached that result. The district court judge or the district court judge. Breyer, since nobody had the plan. Well, they had the summary plan description, and they did not make an issue of it. They had all sorts of discovery requests, but never made a request to the district court judge. But, I mean, wouldn't the normal result of such a case, like any contract case, where you have language, even if it was the word any, it doesn't mean wheat grown on Mars, okay? And so you'd say, if it says you can recover anything at any expense, it means, yes, you can recover. That's what was paid, but not money that you had to pay to get the amount paid. Justice Breyer, we absolutely agree that a plan could be written in order to embrace the plan. But this is a plan that they wrote it at, at U.S. Air Force. So it's a plan that's not going to be widely available, and it's going to be highly unusual for this Court, indeed, I think procedurally unavailable for this Court. Counsel, I guess your opponent could have raised that point. Absolutely. And didn't raise it. Absolutely. And we took this case on the assumption that there's an issue of law involved. All right. So I came off the assumption that we're not going to- So not on the assumption that we're not going to- What is the issue of law? The issue of law is what happens if we have a plan which says, Joe Smith, my employee, if you have to spend $90,000 to get back $92,000, you have to give us back all 92, even though you only have two in pocket. And we're supposed to assume that's what the contract said. Is that right? And then we say, now, can you override that with the principle of equity? Is that the issue you see before us? So, again, we aren't overriding it with the principle of equity. We're saying that the rules of equity, if they have in the plan an abrogation of the common fund, as that is here in the way this case comes to the Court, then that is what settles the question. Now, you could have a Sereboff plan which says the reverse, which says we're going to have a common fund doctrine and avoid that problem at the outset. The parties evaluate the valuation of the transfer of assets at the outset, and that's what controls. And if they want to buy into the common fund, as this Court said in Sereboff, that's absolutely enforceable. And so it's not a contract around, Justice Sotomayor, doctrines of equity. It's simply a reflection of the general rule that in equity, when we're talking about equitable liens by agreement, it is the agreement that controls, that sets the ball game. The right to have it. Roberts, was the plan available to the employee at any time before this litigation? Sure. If they had asked for the plan, it could have been provided to them. They had asked. Are they advised that they can ask for the plan? I'm not quite sure about that. I will look into that and try and get you an answer. I thought it took most of the litigation for the plan to be provided. Justice Sotomayor, at the outset they asked for the summary plan description or the plan. The summary plan description was provided. Only the lawyer. You say they. I assume you mean their lawyer. Their lawyer. This is not, you know, an ignorant layman who knows nothing about the law. That's correct. The lawyer, you say, did not ask for the plan. And I should say, the minute that US Air found out that a tort plaintiff's lawyer was hired, they sent a letter to that lawyer saying, we assert a right of reimbursement. Mr. Kagan, could I ask you about the legal argument that you are making, the distinction you're making between reimbursement agreements and subrogation agreements, which you think, seem to think is critical here. And, you know, once you put it in one box rather than another, some result follows. Different results follow. So how do you know whether you have a reimbursement agreement or a subrogation agreement, and what follows from that categorization? So, Justice Kagan, there are two very distinct rights. Subrogation is the right to stand in someone else's shoes. And so the plan says, we are going to inherit all of the benefits and burdens of the insured in bringing an action. It's a vicarious thought. It's a kind of vicarious notion. Reimbursement is an entirely different concept. It's the idea that, look, we're not obligated to give you this money because we're not at fault in this accident, but we're going to essentially advance it to you. But you've got to reimburse us for it. So if this were a subrogation agreement, what would follow? So if it were a subrogation agreement, I think my friend's case on the other side gets a lot stronger, because there are subrogation cases that have different rules. But when you talk about reimbursement, which is not the right to stand in someone's shoes, but a first priority absolute agreement between the parties to give money, it's just simply a dispute about that money.   Kagan, do you take that because that's the way the Court has come to us, or is there an argument about why there's a reimbursement? There is an argument. And, indeed, all I think you have to do, Justice Kagan, is look at what happened in Sereboff, because in Sereboff you had essentially the same thing, a plan that had both a reimbursement provision and a subrogation provision. And the beneficiaries in Sereboff were saying, hey, this is subrogation, this is subrogation. And that language that I had read to Justice Ginsburg at page 368, as well as earlier language in the opinion, said, no, this is actually a claim for an equitable lien by agreement that does not sound in subrogation, that sounds in reimbursement. And so all you have to do here is precisely what this Court unanimously did in Sereboff, which is to say, look at the nature of the action. Is this an action that seeks personal liability? Does it specify a particular fund? The typical hallmarks of an action for an equitable lien by agreement, and if those are present as they are here, that is enough. Alitoso, are you in effect asking for a windfall because Mr. McCutcheon and his attorneys didn't understand what ERISA means in this context? If they understood that things would work out the way you think they should work out, and they saw that the limits of the insurance policies against which they could collect were $110,000, wouldn't they have realized that this was a suit that wasn't worth pursuing? There would be no point in doing it because nothing would be gained for Mr. McCutcheon or for the attorneys. Not at all, Justice Alito. Two things. One, the rule on ERISA, this rule has been the rule in the Third Circuit since Federal Express v. Ryan in 1996. This is a long-established rule, and if an attorney comes and takes a case knowing that there is an ERISA plan at stake, it seems to me they are at least on inquiry notice that there would be some sort of debt. Well, perhaps they should have realized it, but if they realized it, they have no incentive to pursue this litigation. Not so, this is both in our brief as well as the Blue Cross-Amicus brief. What usually happens in these situations is that an agreement is struck in advance before the lawsuit is filed between the plan and the plaintiff's attorney to reach some accommodation. After all, the plan has an incentive in some sort of action. Sotomayor, in this case, he wrote, the attorney wrote to you any number of times and finally said, look, unless you come and tell me what your position is, I'm going to go forward. So what are attorneys supposed to do in those situations, just drop the lawsuit? Your Honor, I don't think that quite is an accurate statement of the facts. That was precisely what the district court evaluated on the summary judgment motion. They had made a big issue about our failure to communicate and so on. The district court rejected all of those arguments at the Petition Court. Sotomayor, because it had nothing to do with the agreement, but it didn't reject them as a factual matter. They were contacted. I do think that there were lots, and this is at Joint Appendix pages 50 to 64, lots of communications between the two. Now, here's the worst. One place where there wasn't communication, which was they went and negotiated a secret settlement of $100,000, and when U.S. Air found out about it. Sotomayor, were they supposed to, if the insurance limit was $100,000, are you suggesting that that was a bad faith settlement? I'm suggesting that we didn't have the opportunity, Justice Sotomayor, that we typically do in the lion's share of cases, as I was saying to Justice Alito, where you work these things out in advance with clear lines of communication. And so. Kennedy, Justice Kagan's question had two parts. She said, tell me about the two boxes, subrogation and reimbursement. I think there's quite a bit to your argument that this is not subrogation. The plan is rather confusingly drafted. The plan calls it subrogation. I don't think it really means subrogation. If it's not subrogation, Justice Kagan's question was, what then? The common fund rule still does not apply? Because? Because the common fund rule, and this we are in agreement on the parties, the common fund rule does not apply to the cost enrichment. This is what they say at page 26. This is what all the courts say common fund is. And indeed, up until six months ago, seven different circuit courts had evaluated this question of whether the agreement can trump the common fund doctrine. Twenty-one of twenty-one circuit court judges all said it did. Only. Kennedy, you are still in equity pursuant to the statute. Yes. And are you saying that there's no discretion in the equitable decrees that the judge made? That is precisely right. The agreement sets the evaluation of the parties. That's what the State Farm case says, what their own treatise says, what the Arkansas Supreme Court says. That's not unusual. The motto is equity follows the law. Doesn't that usually be? Isn't that usually the case? That is correct. Where there is a legal right, equity cannot overcome it. That is correct. And as the Solicitor General says at page 17, quoting the restatement, a valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment, any inquiry. If I could reserve the balance of my time. Roberts. Thank you, counsel. Mr. Palmore. Thank you, Mr. Chief Justice, and may it please the Court. As this Court's case is recognized, section 502a3 invokes the equitable powers of the district court. All the remedial powers of the court in equity are available that under section 502a3 that would have been available when an analogous claim was brought. Equitable powers to enforce the agreement. Yes. And so we agree with Mr. Katyal on what we've characterized as the first question presented, that we think is essentially decided by this Court's case in Saraboff. At equity, when there was an equitable lien by agreement, that agreement was generally enforceable according to its terms. It was like a mortgage is the classic case. And the mortgage gave a security interest in land, and if the debt was not paid off, then the lien holder could foreclose on that land. Mr. Palmore, do you agree with Mr. Katyal's view of this distinction between subjugation agreements and reimbursement agreements and which this agreement is? I think that's a — there is certainly a distinction, and the Couch Insurance Treatise talks about the distinction, but the Couch Insurance Treatise also explains that the terms are often used interchangeably in a confusing way. So I don't think that the bright line that Mr. Katyal seeks to establish between subjugation and reimbursement is necessarily reflected in all the cases and all the cases. Scalia. Well, I mean, you could say that about any legal rule, that some courts bollocks them up. I mean, that means the rule doesn't exist. Because it's sometimes used in a confusing way? No, I think that it's just the fact that the courts do use terms interchangeably. What's the rule? What's the rule? Do you acknowledge that that is the rule? We acknowledge that when there is a — when there is a contractual, plan-based reimbursement provision like this, it is enforceable as an equitable lien by agreement in the same way that an equitable lien by agreement would have been enforced at every point. But I think Mr. Katyal said that if this were a subjugation agreement, Mr. McCutcheon would have a much better argument because a different set of rules would apply. And so that makes this categorization question quite meaningful. Now, you could say, well, we don't see it as all that meaningful. We think no matter what you call this agreement, the same rules apply. Or you could say, yes, different rules apply with respect to these two different kinds of agreements, and your job is to figure out which kind of agreement this is. Right. We think as the case comes to the Court, this is a case for reimbursement. This is just like Sereboff, and this is a reimbursement agreement. What adds to the confusion is that in — if you look at more modern insurance decisions, they are bringing in all kinds of concepts from State law, from insurance law, from public policy of the State. They don't necessarily reflect what would have happened in a court in equity at the time of the divided bench, and that's the inquiry. Breyer. That's my exact question. I think now what we are being asked to decide is, from your point of view, does the common fund doctrine apply? I take it the common fund doctrine says if this victim here got some money back from the person who caused the accident, that that money goes into a common fund in the sense that those who share in the fund must share as well in the cost of producing the fund. So if it costs $50,000 to produce 100,000, which is in the fund, that we have to have U.S. Air as well pay part of the cost of producing the fund. That sounds very fair. But I hear the argument, fair though it is, we have here an agreement, and in this agreement it says, it's as if it said, and you shall not apply the common fund doctrine or any other equitable doctrine such as he who seeks equity must do equity, et cetera. And I think that's the question that's being asked. And so what is your response to that? In particular, why do you say the common fund doctrine applies, though the contract says it doesn't, we assume, but all these other equitable doctrines don't apply? Because we think the equitable doctrines that apply are the equitable doctrines that would have applied at equity. Good. So now we have 18th century authority which says that in the 18th century, Lord Cook or someone said that the common fund doctrine applies, but the other doctrines don't. And the name and citation to that authority is? Well, there's not one authority that's going to give you both answers. But the equitable lien by agreement cases from the time of equity, as I mentioned before, were typically mortgage cases or a promise to provide future acquired funds to discharge a debt. And it's clear under those cases that that could be executed according to its terms. The unjust enrichment principles that Respondent is invoking were in a really different silo involving equitable restitution. And this Court in Sereboff said, we're not going to look at equitable restitution principles. We are going to look at equitable lien by agreement cases. Now, there's a separate line of authority involving the common fund that we talk about in our brief. And as Mr. Cottrell said, it has at times been characterized as an unjust enrichment doctrine, but its roots are different. Its roots are actually in an analogy to trust law. If you look back to the principal case that established this, the Greeno case that we talk about in our brief, the Court said that Mr. Vose, who the bondholder who had secured a benefit for all the bondholders, had, while not a trustee, had acted the part of a trustee. And it was a well-settled principle of trust law, both then and now, that a trustee is entitled to reimbursement for reasonable expenses from the trust itself. Scalia, was there an agreement that contradicted that? There was no agreement in Greeno that contradicted that. No, but we have an agreement here, so how does that line of authority apply? We have an agreement, which says that the insurance company gets all the money. So you either say that that agreement can be overcome by equity, or else you say the agreement prevails. There are two answers, Justice Scalia. One is that a plan can't add to or subtract from the powers of a court in equity under Section 502A3. A plan couldn't disclaim a claimant's ability to get an injunction. But it only has the powers to enforce the agreement. The powers to enforce. There are various equitable powers, and it can use various of them to enforce the agreement. We don't think that's quite different from rewriting the agreement, which is what you are using it for here. No. We are saying is that Section 502A3 takes the settled powers of the court in equity as it finds them, and the plan can't divest the court of those powers, it can't add to those powers, like this Court held in Great West, it also can't take away from them. But if I could go to an equity answer, because I think this is important. Scalia. Do you really think that if an equity court finds the agreement to be unfair, it can say he who seeks equity must do equity and rewrite the agreement so that it's fairer? Not on general unfairness grounds, but it was a settled principle of trust law. And remember, Greeno based the common fund doctrine on trust law, that if, for instance, a trust document had said the trustee shall take his expenses from the trust corpus, not from the income, or vice versa, said the trustee shall take his expenses from the income, but not from the trust corpus, if that proved unworkable or unfair and the trustee couldn't discharge his obligations to maintain the trust, the court at equity had broad reformation powers and was not bound by that trust document. Thank you. Roberts. Roberts Counsel, the position that the United States is advancing today is different from the position that the United States previously advanced. You make that point in footnote 9 of your brief. You say that in prior case this Secretary of Labor took this position. And then you say that upon further reflection the Secretary is now of the view that's not the reason. It wasn't further reflection. We have a new Secretary now under a new administration. Right? We do have a new Secretary under a new administration. But that's the point. Roberts I think it would be more candid for your office to tell us when there's a change in position that it's not based on further reflection of the Secretary. It's not that the Secretary is now of the view there's been a change. We're seeing a lot of that lately. It's perfectly fine if you want to change your position. But don't tell us it's because the Secretary has reviewed the matter further. The Secretary is now of the view. Tell us it's because there's a new Secretary. With respect, Mr. Chief Justice, the law has changed since that brief was filed nearly 10 years ago in the courts of appeals. That was before Sarah Paulson. Don't say the Secretary is now of the view. It's not the same person. You cite the prior Secretary by name, and then you say the Secretary is now of the view. I found that a little disingenuous. Well, I apologize for that, Your Honor. But we do cite in that footnote the Amara case, and that is a key element to our position here, because Amara said that section 502A3 incorporates the traditional powers of the court at equity. And it talked about not only the ability to issue an injunction, but the ability to provide for a surcharge remedy, the ability to reform contracts. Nobody ever doubted that before. Was it thought before that all the equitable powers did not exist under ERISA? These cases weren't litigated in the way they are now before Sarah Paulson, before Amara. It seemed to be self-evident that the court had all equitable powers. That's not a change in the law. It's just a restatement of the obvious. And we think the court has all equitable powers, and a planned term can't divest the court of those equitable powers. So among those equitable powers was the ability to enforce an equitable lien by agreement without looking at inapplicable unjust enrichment. Or not to enforce it, meaning the equity is to enforce it or to stay your hand. And so the court could decide not to reach into the pocket of the planned participant to pay back money that the lawyer has. Well, we do agree with respect to the common fund doctrine. And we think that to the extent this Court is willing to look at the purposes of ERISA, that the position that we've advanced strikes the right balance, and in particular, it avoids the net negative recovery scenario that's a particularly harsh result of Petitioner's position. Thank you, counsel. Mr. Wessler. Mr. Chief Justice, may it please the Court. Reimbursement claims that are based on an express subrogation agreement are subject to equitable principles of subrogation. In equity, these claims were governed according to the same principles that governed every other type of subrogation agreement. Your opponent says this is not a subrogation agreement, so that argument goes nowhere. He would concede that point. You have to tell us why this is a subrogation agreement, even though you conceded below that it isn't. Your Honor, it is a subrogation agreement. The claim, however, that Petitioners have pursued here is a reimbursement claim, and it's – but it's based on an express subrogation clause. And in equity, reimbursement claims, which, to be clear, are distinct from subrogation claims because they involve a suit directly against the insured as opposed to against the tortfeasor, are governed by the same principles of subrogation that equity treated – that equity used to apply to all claims that involved an insurer who was seeking to recover money from either an insured or a tortfeasor. And so we concede absolutely, Your Honor, that the claim is one for reimbursement for monies recovered out of a fund obtained by the insured, but it's – but it's based on an express subrogation. Scalia. That's not what I say you've conceded. That's a common fund doctrine. Your opponent denies that the common fund doctrine applies, and it says this is an equitable lien by agreement, so that the common fund doctrine doesn't apply. Now, you say it is not an equitable lien by agreement. Is that your position? No, Your Honor. We – it is – we – to be clear, it is an equitable lien by agreement, but it arises within the doctrine of subrogation, which is, as Couch and Palmer and other treatises explain, is an umbrella term that is used to describe all of the rights and rules that govern claims by insurers for money back after they've paid it out under a policy. Now, the form of the action in this case is a claim for reimbursement out of a fund. But the mere fact that that's the form of the action, which in Sereboff this Court called an equitable lien by agreement, does not alter the underlying rules that equity courts in the days of the divided bench would have applied to the claim. But doesn't Sereboff suggest not? I mean, I realize that Sereboff has this footnote, but if you read the text in Sereboff, it says these affirmative defenses that would arise in a normal subrogation context are beside the point. So how are they not beside the point? They're not beside the point for one reason, and let me explain why. What the Court actually said in Sereboff was that the parcel of equitable defenses accompanying a freestanding claim or freestanding action for equitable subrogation are beside the point. A freestanding action for equitable subrogation is not one based on an agreement. It's an implied claim, a claim for subrogation or reimbursement based on the mere fact that the insurer has paid the money. So is that true, that in Sereboff there was no agreement? There was, but what this Court – there was absolutely an agreement, just as there is an agreement in this case. But what the distinction the Court drew in Sereboff was it said that whatever principles apply to freestanding claims are beside the point, because – precisely because the claim was based on an agreement. That is absolutely correct, and it's perfectly consistent with our position, because we believe that the principles in equity that governed exactly the kinds of claims that were at issue in Sereboff and are at issue here, reimbursement claims based on an express agreement, are in fact governed by the same principles of unjust enrichment. Kagan. Kagan. I guess I don't understand that, because it seems to me that when Sereboff said it was beside the point, they were refuting the arguments that the insured party was making, that the insured party was saying, hey, look, we have these great defenses, and you're saying they had an agreement, but they also said they had these great defenses, and the Court said, too bad, those defenses don't work for you here. The Court – the beneficiary, Your Honor, in Sereboff argued that the defenses that applied to a freestanding or implied claim for equitable subrogation should control the measure of relief available in the case. They said the contract doesn't matter. The agreement makes no difference. What the plan is trying to obtain here is a pure freestanding claim for subrogation. And look at all these great rules that apply to that kind of claim. And the Court said absolutely correctly in Sereboff, whatever those principles are doesn't matter, because this is a claim based on an agreement. But what our view in this case is is that it doesn't matter. Sotomayor, what's the difference between the two? Meaning, I take your argument to be that the Court was right before that freestanding subrogation claims have one set of remedies or rights, and subrogation by agreement have another. So what do you see as the differences between the two? When it comes to the rules that govern relief, there is no difference. The same principle of unjust enrichment controls, and it limits and insure to recovering out of the fund only the court in an exercise of futility in writing what it did in Sereboff? Not so, Your Honor. It did not reach the question in Sereboff of what rules apply to reimbursement claims based on express agreement. That was footnote 2. The Court said, all we're holding in Sereboff is this is a claim. Sotomayor, I understand the argument. It's a bit unsettling that you've got two kinds of rights, one implied and one expressed, and there's no difference between the two. You've got to give them a little bit more body to have a persuasive argument. Your Honor, in equity, that was the rule. And I'll point this Court's attention to the leading treatise on equity, it's Palmer's And what Palmer says, and he discusses precisely this claim on pages 473 and 474 of his treatise, and it's cited on page 21 of our brief, and he says that the same principle of unjust enrichment controls claims for reimbursement arising out of an express agreement, and I'm quoting here. Sotomayor, did you have another line after that that says something? Yes, I'm about to quote that, and he says that that principle, quote, Is this the part, and I may be mixing this up with something else, but is this the part where he says, unfortunately, the courts don't agree with that? He identifies two decisions that, you're correct, Your Honor, he identifies two decisions which did something contrary to what the courts agreed to, and he says that the courts did something contrary to that rule, but in his view, that is the rule that governs these claims. Let's go back to what the simple argument, we have an agreement here, and the plan is asking for what the agreement gives it. Why is the plan unjustly enriched by receiving exactly what the plan entitles it to receive? Because, Your Honor, these insurance reimbursement cases arose in a very different context from most other equitable lien by agreement cases. And the core difference between these cases and all 22 or more of the cases that the Petitioner cites is that they involve a third party who has caused the loss both to the insurer and the insured. And that third party, the tortfeasor, in these reimbursement cases is not the defendant. And so in two-party equitable lien by agreement cases, which are all of the cases that Petitioner cites involve two-party cases in which the defendant is also the wrongdoer, is the person who is culpable and who has caused the plaintiff's loss. In those cases, when courts awarded relief, they awarded relief that was consistent with the defendant's unjust enrichment, but was also coextensive with or consistent with the loss under the contract. In these three-party cases, however, because the defendant, who is a beneficiary, not the tortfeasor, did not actually trigger the loss, courts developed in equity a different set of rules to apply, to measure the relief available under the claim. And what they said was where there is a fund that is insufficient, where it cannot cover all of the losses suffered by all of the parties, that all of the parties must share equally with the loss. And Palmer itself has an entire chapter devoted to third-party problems. Breyer, why is it so unfair? I've been putting it in a way that looks unfair, which favors your side, but U.S. Air, or the equivalent, says now here is the deal. We'll pay your medical expenses, and now if somebody causes those expenses, you come to us, and we decide whether we want to sue and get our expenses back, and any extra money we give to you, and we pay our attorneys' fees extra. They don't count against the fund. Now, if our lawyers tell us it isn't worth it, you're free to sue. But I'll tell you what, your lawyer is going to be at the end of the queue. We're first, then comes your lawyer, and anything left over goes to you. Now, if you can find a lawyer that takes it on those conditions, good for you. But he might, because he might think he's going to get better. Our lawyers have already told us it's not going to work, so that's the situation. Now, what's unfair about that? That's make sure we get our money back. That's what we want to do. And you're free to sue. It's just your lawyer who's going to come at the end of the queue. Okay? Why is that unfair? Your Honor, it's unfair because in equity, parties could not defeat the rules that typically apply. Now, if this were a legal case and that were a legal claim, there's nothing unfair about that. The parties can structure their contracts or agreements as they see fit. But the fact is that we are talking about the rules that equity applied in these situations. Scalia. So whenever you have a contract that explicitly, although, you know, nowadays with the merged bars, I suppose you wouldn't even have to say it, but let's assume it explicitly says that rights under this contract can be enforced in law or at law or in equity. Whenever you have a contract like that, it's going to be up to the court of equity to decide whether it's fair? No, Your Honor. I don't think that's right. And I would point the Court to its decision in McKee in 1935, in which it drew a distinction between a claim in equity that was a legal claim based on a contract, which could happen, and a claim in equity that was a, quote, purely equitable claim based on the contract. Why isn't this a legal claim? It's a promise made in a contract. Why is that not a legal claim? To be sure, the contract says that, you know, all equitable remedies are available to enforce that claim. But why is it an equitable claim, not a legal claim? It could be either, Your Honor. And we've cited to this Court cases in the days of the divided bench in which a party could have sought legal relief for breach for this exact kind of claim. But there was also a remedy that a party could seek in equity. But in order to do that, in order to enter equity's doors on this reimbursement theory, it had to agree to allow other parties their correlative rights in equity, and it also had to agree not to override or defeat the rules in equity that typically  Ginsburg. Couldn't that party simply say, I want to go to the other side of the Court? You just made a distinction between the remedy at law and at equity. This is the plan, and if the plan is told, well, if you go to equity, you get all these extra things, it could say, I'm asserting my rights at law. No, Your Honor. The plan is in a bind here, and we know this from Sereboff and Great West and Mertens. They cannot seek legal relief under this contract. The only remit, the only provision in ERISA's enforcement section that allows that is section 502a1b, and it says a party has rights to enforce the terms of the plan. But fiduciaries like Petitioner are not allowed to pursue relief under that provision. So all they get is purely equitable relief under 502a3. Kennedy, The general rule in equity was that the equity court would not give a specific performance decree to pay a certain amount of money. It was the general rule. Were there exceptions? And if so, do those exceptions bear on this case? And there were exceptions, but we don't view this case as a specific performance case, and I'm not for Petitioner's view either. You don't view the case as? As a specific performance case. That was a specific type of remedy. The remedy here that's being sought is an equitable lien by agreement. But in our view, when an insurer sought to enforce through an equitable lien by agreement a claim or a lien on a fund, it must agree to take that relief subject to the way equity would have treated the claim. And what Palmer and what Couch and what the cases we cited say is that even for those reimbursement claims that are based or arise on an express agreement, the relief available is limited in two concrete ways. The insurer could not get more out of the fund than its share of the fund that accounted for the medical expenses it paid, and it must have agreed to reduce proportionally for an amount of fees and costs. Breyer. And your best case, what is your best case? I'd love to find a case that says something like this. The Speyer case, Your Honor, which is the one that I'm thinking of, there's a contract all written down. They forgot to put a seal on it. They forgot to put a seal on it, so I guess it's now 1463 or some year like that. So they go into equity, and now they're in equity. And the plaintiff says, Judge, I want you to enforce this contract. He says, I'm a judge in equity. He says, I know, but we've agreed, you enforce it in equity. The contract says, give Smith all the wheat, and equity says, you know, there are other people who would like some of this wheat, too. So we're not going to follow the contract. We're going to modify the contract according to equitable principles, which is you say they could do. And the other side says, no, they wouldn't. They'd follow the contract. They're just in equity because they forgot the seal. Okay. What is your best case to show they did indeed modify it with the common fund doctrine or some other doctrine? I want to be sure to read it with a magnifying glass. Your Honor, to be clear, there is not a single equitable lien case that Petitioners have found in which a court has not. I know. I wasn't asking about what they found. I was asking what you found. So, Your Honor, the Svea case is, I think, our best example. And in that case, the insurer had a subrogation agreement which authorized it to recover — authorized recovery to, quote, the extent of its payment out of, quote, all rights of recovery of the insured. And in that case, there was an underlying settlement that the insured reached with the tortfeasor, the wrongdoer. And after that occurred, the insurer did not participate in that underlying proceeding at all. And after that occurred, the insurer then directly sued the insured. This is exactly the kind of case we're talking about here, seeking recovery out of the fund. And they based that claim on their — on their express subrogation agreement. And they said, we paid approximately $3,000. You recovered something like $9,000. We should get $3,000 back. And the court there said no, because the fund was insufficient to cover all of the losses. The insured did not recover for all of its losses. Several other claimants did not recover for all of their losses. And the court said that because the fund was insufficient, the insurer was limited to recovering, and I'm quoting here, no more than its proportion of the amount recovered after deducting costs and fees. And so they applied both the double recovery cap that we believe applied in every single case in equity in which an insurer sought to recover. Scalia, this is the Svea case, Your Honor. Scalia, from what court? What court? The court in Maryland, I believe, from 1901. Mr. Wessner, would it be fair to say — I mean, we're in this unusual position because we're supposed to be looking back to before the 1930s sometime. Would it be fair to say that we just don't have very many cases, and Mr. Katyal doesn't have any, and you don't have any, that raise this question, that where somebody walks into an equity court with a contract and we try to figure out whether the equity defenses? Would it be fair to say that we just don't know? Wessner, I think that it's fair to say that this did not arise that frequently in courts of equity. Why didn't it? For several reasons, Your Honor. First, most of these claims arose simply as freestanding or implied claims. So there was not the — there was no need for an insurer to include in its insurance policy an express subrogation agreement. However, that changed approximately around the mid-20th century when medical insurance started to become an increasing commodity, when that occurred, that most States had a prohibition on the assignment of personal injury claims. And so what insurers began to do to get around that prohibition was to insert in their policies an express clause allowing them to obtain reimbursement from the insured in the event that the insured recovered money that it had paid. Now, there's another reason in this case or in these ERISA cases why these agreements need to be in the plan, and that's because Section 502A3 itself does not allow for a plan like Petitioner to obtain a general right to equitable relief. All that the Petitioner can seek here is equitable — appropriate equitable relief to enforce the terms of its plan. And so in the absence of an express provision like a subrogation clause, it would not be entitled to pursue a general right to subrogation. It's a term — that back-end reference is a term of limitation that limits the types of claims that Petitioner can bring in these cases. Roberts, I want to give you an opportunity to respond to the argument that you waived, the — your argument based on the distinction between the summary of the plan and the plan. And there are two things that concern me about that in particular. The summary of the plan, which you've had all the time, says on page 1, this is only a summary. Complete plan details are contained in a legal plan document. If there's any difference between the information in the summary and the legal plan, the legal plan doc — the legal plan document will govern. So when you had the summary, you were on notice that if there were any difference between it and the plan, the plan would govern. You received a copy of the plan in June of 2012, okay? And as late as August 29th of 2012, two and a half months afterward, you filed a joint appendix that didn't contain the provision that you say now governs. So why shouldn't you be held to have waived that? The first time we found out about that was in your red brief that was filed June, October, four months after you had the plan. So didn't you waive it? Well, I don't think we waived it, Your Honor. It's in our opening brief on the merits to this Court, and — Which was four months after you had the plan, and the plan was lodged with us last week for the first time. That's correct, Your Honor. In our view, and I think I need to be clear about this, I mean, the fact that the plan contains a different set of rights than the SPD to us is meaningful in its effect that it will have on this case if and when this Court remands, because in our view the rights are different. However, it doesn't change the underlying nature of our argument, which is that even the strong form argument that Petitioners have made here, which is that on the SPD, it can defeat the rules that typically would have applied, that equity would not have allowed that. And so the problem is that the district court interpreted the plan as precluding the claim you're making here. And your argument that that's not true is based not on the summary of the plan, but on the plan itself. And what the district court does is it defers to the administrator's interpretation of the plan.  was not arbitrary and capricious. So what your friend is arguing is that, well, you're kind of stuck with the district court interpretation and you can't, at the last minute, argue that it shouldn't control because of some other document. Well, we think we do have the right to argue that on remand, Your Honor, and this Court's decision in Cigna only arose in this case after the briefs were completed to the Third Circuit. And so it's a — I think Cigna has changed the law to the extent that all parties are now on notice and know that the plan document will trump any contrary language that the district did. Well, no, Cigna didn't tell you that. The plan — the summary told you that. It says complete plan details are in the legal plan. If there's any difference between the summary and the plan, the plan controls. So you didn't need Cigna to tell you that. Well, Your Honor, I mean, I think that the — you know, for us, that's an issue on remand. We're comfortable that our arguments in this case control, even as it relates to the actual language in the SPD, and that whatever differences between the SPD and the plan actually are don't necessarily change the rules that govern when a party in equity sought this kind of reimbursement relief directly from an insured. I'd like just for the last minute or so to discuss the common fund rule, because I do think it applies as a separate and distinct rule, regardless of how this Court interprets the agreement as governing the rights between Mr. McCutcheon, the beneficiary, and the plan. And I'd just like to point out that this Court in Pettis made clear that the common fund doctrine confers a separate lien on the attorney. And so whatever the agreement's control between the beneficiary and the plan has, it cannot defeat the rights that the attorney has as a separate matter to come into court and invoke its own lien on the fund as a first-priority lien over the money. And I'd just like to point out that Petitioners have not responded to that argument. Nowhere in the reply brief did they explain why their theory would allow them to defeat the rights of a third party defendant in this case, Mr. McCutcheon's lawyers, who have their own separate right to the lien. And none of their equitable lien cases, Your Honor, involve any kind of common fund whatsoever. So they say precisely nothing about the rules that would have applied in equity to an attorney's attempt to take their proportion out of the fund before it was distributed to any of the parties. Ginsburg. I thought you were discussing the common fund would be the allocation between McCutcheon and the plan, but now you seem to be talking only about the attorney's right to come in first. The common fund, Your Honor, applies either to deduct, either as a deduction off the, Your Honor, may I, may I answer the question, as a deduction out of the entire fund for the attorney's lien, or it can be applied to reduce proportionally each of the claimant's claims to that fund. And in this case, it should be applied to reduce Petitioners' claim on the fund, irrespective of McCutcheon's own claim. Thank you. Roberts. Thank you, counsel. Mr. Katyal, you have four minutes remaining. Thank you. I'd like to begin where Mr. Wessler left off with the common fund and make three quick points. The first is that both equity law and ERISA law point in the same direction. Justice Scalia is absolutely right that they have zero cases that say if there is a preexisting agreement that settles the common fund doctrine, that that makes it not enforceable. And Justice Ginsburg is absolutely right to say that when a plan, a plan is not unjustly enriched to get the money that they are entitled to get under the contract. The second point I would make is that the Solicitor General says, well, this is now not a doctrine. Sotomayor, on the back of someone else, meaning I agree, I may or may not agree that in terms of your split with the participant, the contract might control. But I still am having trouble with understanding how you can bind a third party, like a lawyer, who's done the effort to recover that fund. More along Justice Breyer's question, which is not only in all equity, lawyers are entitled, whether by contract or by unjust enrichment principles, to a percentage of their expenses in recovering something. Right, Justice Sotomayor, that's precisely what cases like State Farm and the Arkansas case from 1969, the Maryland case from 1931 address, which is that situation. And the reason is that essentially here, it's a mistake to see this as a third party case. This is really a situation created by Mr. McCutcheon double promising the same money to two entities, U.S. Air and to his lawyers. And so it's essentially a dispute really among two parties, not three. Now, the Solicitor General says, well, this is rooted in an equitable doctrine. There is no case that they have that says that there's some equitable doctrine that trumps a preexisting agreement. And indeed, the case that they cite, the Greenough case, is one that essentially relies on unjust enrichment principles. Sure, the Court has an equity power when to remedy unjust enrichment. That is an inherent power of the Court. We're not disagreeing with that. What we are saying is that when you have an agreement in advance, that means, per se, there is no unjust enrichment, that they are, to use this Court's language, in Sereboff, a defense that is beside the point. Sotomayor, I'm assuming, because ERISA is in place now, that the many State laws that prohibit this kind of agreement, where insurance plans are seeking full reimbursement despite an attorney's efforts, that those are void, that's pretty enforceable. That is precisely what we're saying. The only one who can fix this problem now is Congress. That is correct. If Congress in 1974 set it up this way, and I think that's an important point, Justice Sotomayor, for 38 years this Court has never embraced an idea that Federal common law allows rewriting of plan terms. It would be a very dangerous doctrine to do so. It would be standardless. And here is a very vivid example. They are saying that it is inequitable to have the Federal Blue Cross Blue Shield plan, which governs 4.6 million people, including perhaps members of this Court, which has the exact same provisions as the U.S. Air Plan, an abrogation of common fund, and a 100 percent reimbursement provision. And they are saying that that would not be enforceable. That may create any number of problems for the government, I imagine, when it tries to enforce that. Breyer. If the expense weren't to pay the lawyer, suppose in order to get the $100,000 you had, for example, to build a model car to demonstrate to the manufacturer what caused the injury, it costs you $98,000 to do it, and they pay you $100,000. You are saying that it wouldn't be unjust to say the $100,000 has to go to back to pay U.S. Air? Justice Breyer, if the agreement settled that in advance, yes, it would not be unjust. It is the agreement that controls. Thank you, counsel. Counsel. The case is submitted.